14230

STACKHOUSE v. STANTON

(184 S. E., 105)

514

*Messrs. Joe P. Lane* and *N. B. Hargrove,* for appellant,

*Messrs. Gibson & Muller,* for respondent, 

February 13, 1936.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

This is an action for the possession of real estate. The plaintiff relies upon a deed to the land in question, consisting of 155 acres in Dillon County, which was made and delivered to him by the defendant the 14th day of January, 1929, and recorded on the 21st day of January, 1929.

The defendant admits the execution and delivery of the deed, but alleges that it was given as security for debt and is in effect a mortgage.

The matter was heard by Judge Oxner, without a jury. The evidence was taken by him in open Court. By his decree, subsequently filed, he held the instrument to be a deed absolute which conveyed the land in dispute to the plaintiff; that the plaintiff was entitled to the immediate possession of the land. It is from that decree this appeal comes. It is founded upon various exceptions. There is, however, but one vital issue in the case, viz.: Was the instrument of date January 14, 1929, from H. C. Stanton to Wade Stackhouse, intended as a deed absolute, conveying the fee and the defendant's equity of redemption, or was it intended as a security for a debt, and, hence, as a mortgage?

There can be little controversy over the law in such case. In this jurisdiction the law which determines whether a written instrument, in form a deed, is in equity a mortgage, is well understood. The difficulty lies in the application of the law, so that in each case the evidence in that case is decisive. The fundamental principle applicable

in such cases is thus stated by Mr. Justice McIver (afterwards Chief Justice), in the case of *Brownlee v. Martin*, 21 S. C., 392, 400: "The law looks with jealousy and suspicion upon all dealings between the mortgagee and the mortgagor, from the supposed influence which the former has over the latter. If therefore a deed, absolute on its face, is shown (as it may be shown by parol evidence), to have been executed merely as a security for a debt, and not intended as an absolute transfer of title, the terms of such agreement or understanding entered into at the time of the execution of the deed are not merged in any subsequent written agreement entered into by the parties. If it is once shown that the deed, though absolute on its face, was, at the time it was executed, only intended as a security for a debt, it will operate only as a mortgage, and it cannot be converted by any subsequent written agreement into an absolute conveyance, unless such subsequent agreement is based upon a sufficient consideration, and is shown to have been fairly made, without undue influence by the creditor; *and the burden of showing this is upon the mortgagee. In other words, it must amount to a sale of the equity of redemption, fairly made, upon sufficient consideration. These views are fully supported by authority.*" (Citing several.) (Italics added.)

The same eminent jurist who declared the above principle of law said in *Tant v. Guess*, 37 S. C., 489, 16 S. E., 472, 479: "In view of the well-settled principle that, even where the mortgagor has conveyed to the mortgagee the equity of redemption, the transaction is to be carefully scrutinized, inasmuch as the law looks with jealousy upon such dealings, in order to see whether the creditor has taken advantage of the influence which his relation to the debtor gives him." (Citing authorities.)

In the case of *Leland v. Morrison*, 92 S. C., 501, 75 S. E., 889, Ann. Cas., 1914-B, 349, it was held:

"2. Parol evidence is admissible to show a deed absolute on its face was intended as a mortgage. * * *

"3. When it is once shown that a deed was intended as a mortgage it is treated as a mortgage from its date until it is barred by the statute, and no act of the parties by laches or otherwise within such time will change the nature of the instrument."

In the case of *Hamilton v. Hamer,* 99 S. C., 31, 82 S. E., 997, 999, there is quoted, with approval, from Pomeroy's Equity Jurisprudence the following: "The general criterion by which the distinction between a deed and a mortgage is made in * * * 'the existence of a debt or liability between the parties, either existing prior to the contract, or * * * arising from a loan made at the time of the contract, or for any other cause, and this debt is still left subsisting * * * so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instrument.' "

It scarcely needs the aid of authorities outside this jurisdiction to sustain principles so well settled by its own authorities, but the case of *Dickens v. Heston,* an Idaho case reported in 53 Idaho, 91, 21 P. (2d), 905, 90 A. L. R., 944, is so much in point we venture to quote from it:

"Inadequacy of consideration is a circumstance tending to show that a deed absolute in form was intended as a mortgage. ·* * *

"In determining whether such instruments constitute a mortgage, we may consider the following circumstances, among others:

"(a) Existence of debt to be secured. The controlling test to be applied in determining whether a given instrument is a mortgage is whether. at the time of the execution of the deed the grantor sustains the relation of debtor to the grantee. * * *

"(b) Satisfaction or survival of the debt. On an issue as to whether a deed absolute in form was intended as an abso-

lute conveyance or as a mortgage, the test is whether there was a subsisting debt after the conveyance. * * *

"(c) Previous negotiations of parties. It is said in 41 C. J., 337, § 100: 'On the question whether a deed absolute in form was intended as a mortgage, it is proper to consider the previous negotiations of the parties, their agreements and conversations and the course of dealings between them prior to and leading up to the deed in question.' * * *

"(d) Inadequacy of price. The following rule is announced in 41 C. J., 337, § 101: 'When the question in issue is whether a deed of land, with an agreement for reconveyance, was made as an absolute conveyance of the property, or simply as a security for a debt or loan, in the nature of a mortgage, the value of the property at the time the deed was made is pertinent and material. For if it shall be shown that the consideration passing between the parties, or the amount to be paid by the grantor on exercising his right to repurchase, would be fairly proportional to the value of the property, if considered as a debt or loan secured by a mortgage thereon, but grossly inadequate if regarded as the price of the land upon an absolute sale, this will tend strongly to show that a sale could not have been intended, but that the transaction should rather be treated as a mortgage.' * * *

"(e) Financial condition of grantor. It is said in 41 C. J., 288, § 24, that: 'If the grantor was severely pressed for money at the time of the transfer, so as not to be able to exercise a perfectly free choice as to the disposition of his property, and raised the sum needed by conveying his property in fee with a right of repurchase, his necessitous condition, especially in connection with the inadequacy of price, will go far to show that a mortgage was intended.' * * *

"(f) Intention of parties. '* * * "A conveyance of the mortgaged premises by the mortgagor to the mortgagee, operates as a bar to the equity of redemption only when it clearly * * * appears that both parties so in-

tended that it should; otherwise it will be regarded as a mere change in the form of the security." ' " Citing authorities.

In the light of the principles and rules of law and evidence thus shown to be of force and applicable, let us analyze the circumstances attending the transaction.

The plaintiff is a man of wealth, and an acute and successful business man. The defendant is a man of limited means, the owner of a tract of land, upon which at the time of this transaction, were mortgages aggregating between $5,000.00 and $6,000.00. Defendant was a farmer. They were both residents of the County of Dillon, the plaintiff residing in the Town of Dillon.

In November, 1928, the Bank of Dillon became insolvent and closed its doors. There had been previously three banks in Dillon which about two years before the named date had been merged with the Bank of Dillon. When, then, the Bank of Dillon closed its doors in November, 1928, it left no bank of general business functioning in the town. Two local chain banks were established in the town, but it was stated that they would not make loans on the security of crops. One mortgage due by defendant on his farm was to the Federal Land Bank for about $4,000.00; one to the Bank of Dillon for $1,111.36, and one to the same bank for $700.00; one to Edgar Stanton for $200.00; one to Wade Stackhouse for $600.00. There was some interest and a debt of $90.00 to plaintiff, making an aggregate indebtedness of about $6,-000.00.

It was necessary for defendant to have advances to operate his farm. In this emergency he applied to plaintiff to make such advances; plaintiff had done so before. This was January 14, 1929. He learned that the affairs of the Bank of Dillon were to be closed up. The plaintiff was a member of the liquidating committee of that bank.

Defendant was asked how he came to go to see plaintiff, and replied: "Well, I didn't come to town specially for that

purpose, but I came in with a friend and learned while in town that the business of the bank was to be settled up, and with my having some papers in the bank I thought I had better look at these papers to see what could be done to get my own affairs in better shape."

He was asked: "When you got to Dr. Stackhouse's, what did you and he have to say to each other? A. He wanted some arrangement made whereby he would be secured for the amount of his mortgages, and I had two or three other small mortgages." At this point he was interrupted.

"Q. Now, what agreement did you and Dr. Stackhouse have? A. I traded with him to give him, as it was, as collateral security." Again he was interrupted.

"The Court: State what he said to you and what you said to him. A. I agreed to this: That if he would give me a few weeks, or three months to raise the money, I would give him a deed to the property to secure him for a few weeks or months.

"The Court: Was there any conversation between you and him as to the purchase and sale of the land? A. No, sir.

"The Court: Did you and he agree on the price of the land? A. The price wasn't mentioned."

The counsel for the plaintiff apparently started to object here. The Court said: "I think he can ask if anything was said with reference to the sale of the land."

"The Witness: There wasn't anything mentioned as to the price of the land.

"Q. Did you have any further conversation with him? A. The agreement was that if I could not get the money within a few weeks, I could stay on the place over a period of years and have a chance to work it out and pay it that way. I had two chances to get the money within a few weeks and pay it up, or stay on the place a period of years and work it out. I had those two chances."

The plaintiff's testimony in regard to this transaction was that he had advanced to Stanton in 1928, and Stanton did

not pay up. He thought he had advanced to him in 1927. His mortgage from Stanton was about the fourth mortgage.

"Q. Did he or not come to you for advances in the early part of '29? A. Yes.

"Q. Did you agree to make them? A. No, I told him I was not able to do so.

"Q. You refused to make advances in '29? A. Absolutely.

"Q. Now Doctor, tell the Court what happened in connection with the execution of that deed by Stanton to you. A. Mr. Stanton came to me early in January, I think about the 4th of January, and wanted to get money to run his crop in '29, and I told him I was not able to advance him, and he of his own accord offered to make me a deed to the land, provided I would let him stay on that year as a share-cropper, and I agreed to it.

"Q. Did he or not state that he was unable to get advances anywhere? A. I think he did.

"Q. What was the consideration of the deed, Doctor? A. I assumed all of the mortgage indebtedness, including my own, and agreed to advance him money to run his crop in '29.

"Q. Did you or not have any agreement at that time as to reconveying that property to him? A. No, none whatever.

"Q. Was that matter discussed at all? A. *I don't think it was."* (Emphasis added because the defendant testifies positively that it was discussed and agreed upon, and it seems strange that on so serious and vital a question this eminently intelligent witness should be in doubt. Evidently his memory is at fault.)

On cross examination plaintiff testified:

"Q. And you did not at that time or prior to the making of the deed, make any offer to him that you would reconvey? A. *Not that I recall."*

This, too, is emphasized because it is in such striking contrast to the statement just made by him on direct examination that he had not agreed to reconvey; and it is equally as

indefinite as the other assertion of plaintiff marked with italics.

This witness was asked if he could tell anything else he and Stanton talked about. He answered: "I don't recollect anything."

At this point the Court asked: "Were you pushing him for the payment of the $1,111.00 mortgage? A. I wanted him to pay the $690.00 for the two mortgages—one for $600.00 and one for $90.00.

"The Court: Were you pushing him at that time? A. I don't know that I was going to sell him but I wanted it paid.

"The Court: Was anything said during that conversation about his indebtedness to you? A. I don't recall anything."

Again the witness' memory is at fault. On direct examination, in answer to the question: "What was the consideration of the deed?" he had said: "I assumed all the mortgage indebtedness, *including my own,* and agreed to advance him money to run his crop in '29." (Italics added.)

It is difficult to understand how this agreement was arrived at without something being said about defendant's indebtedness to plaintiff.

Under cross examination, plaintiff testified that there was no discussion, nor bargaining about what the land was worth. Plaintiff knew the land, owned it once, sold it to defendant's father for $15,000.00—$100.00 an acre.

Here are the direct conflicting statements of plaintiff and defendant as to the circumstances attending the execution of the deed. From this evidence, however, there can be adduced these undisputed facts:

The defendant was in debt; distressed by the necessity to provide for the payment of his mortgage indebtedness to the defunct banks, by the necessity of making provision to run his farm for the year 1929. When first approached, the plaintiff refused to make the advances for the crop. The defendant owed the plaintiff a mortgage debt of around $690.00. Plaintiff does agree to make the advance for the crop of

1929. And the deed comes into being. The authorities we have quoted show that here are some of the indicia which are held to be potent to support the claim that the deed was intended to be a mortgage.

The testimony of the defendant is supported by that of Mr. John W. McKay, a respectable citizen of the county, formerly a member of the House of Representatives from Dillon County, and once its treasurer. He testified that he went to the office of Dr. Stackhouse on business of his own. "Mr. Stanton and Dr. Stackhouse came out of the office. I spoke to Dr. Stackhouse, went back in with him, said Stanton wanted to redeem his plantation, and he told me he would be glad for him to do it if he could, and that he had agreed with him that if he could pay him his money, that was what he needed, he could."

The plaintiff went upon the stand in reply, but he did not deny this testimony of Mr. McKay.

A. L. Wallace, a witness for the defendant, was asked, in reference to a cow trade between plaintiff and defendant, "What, if anything, occurred in the conversation concerning the land? A. That was all, he just said he was backing out of the cow trade at that price, and he was backing out of the land trade."

March 6, 1929, which is within the period in which defendant testified he had the right, under his agreement with plaintiff, to get the money and redeem the land, he received the following letter from plaintiff:

"March 6, 1929.

"Mr. H. C. Stanton, Dillon, S. C.

"Dear Hugh: Your letter March 4th received. I have not paid the Land Bank anything except the interest due and all Taxes due on the land. You would not have to take up the Land Bank Mortgage.

"I am not willing to transfer a Deed to any party except yourself. In other words, I am not willing for you to make preference as to Ownership or anyone, unless you can buy

back the place. It is about time also to finance your farming for this year. I do not see how you can do this with the Deed for the Farm in my name. In order to take back the place it will be necessary for you to pay me back the money I have advanced and also to finance the Place for this year. If you can do this by April 1st of this year, I shall be glad to deed the Land back to you.

"Yours very truly,

"WADE STACKHOUSE."

The defendant testifies that he had arranged with Mr. McIver Rogers to advance him the money to pay Dr. Stackhouse; that Mr. Rogers gave him a check dated and signed payable to Dr. Stackhouse, but the amount left blank, which he presented to Dr. Stackhouse before he received the above letter. That all he could get from him was the extension of the time of payment. It is true that the plaintiff testifies that the check was not presented to him, but an examination of all of his testimony satisfies one that his memory has again misled him, and that his reason for refusing the check was that he had advanced the amount of his demand by $1,000-.00 and because the defendant was intending to deed the land to Mr. Rogers. Mr. Rogers was asked: "What was your intention in giving the check? A. Nothing whatever except to help Mr. Stanton get his place back."

April 30, 1929, the plaintiff wrote the defendant:

"Dillon, S. C., April 30, 1929.

"Mr. H. C. Stanton, Dillon, S. C.

"Dear Sir: This is to agree that if you pay me all you are due on your tract of land which has been deeded to me—on or before Dec. 1, 1929, and pay all interest and any other accounts which may be due me, and outstanding at that time, plus one thousand dollars, I will deed the land back to you free of all incumbrance. It is agreed that I will advance you from time to time any necessary cash to work the farm this year.

"It is understood and agreed that the proceeds of all crops as gathered is to be turned over to me as a credit on the account. If you buy back the farm on this basis I will charge you interest at the rate of 8% per annum on all moneys outstanding including the price of the place. If you fail to buy back the farm on this basis it is agreed and understood that the one-half share contract—verbally made—is to stand. If on the share contract, I agree to furnish land, fertilizer, and you do all the labor—and we divide the crop half and half—including cotton seed.

"The amount of the Federal Land Bank Mortgage is to bear interest at the same rate as charged by the Land Bank.

"Yours very truly,

"WADE STACKHOUSE."

Appearing on the back of this letter are following two separate writings:

"Mr. H. C. Stanton:

"If we settle on the crop of 1929 on the share basis, I agree to accept one-half of all crops made as interest on my investment. If you can redeem the place on or before December 1, 1930, I agree to extend this agreement so as to cover the year 1930, but if place is not redeemed before December 1, 1930, we are to work the next crop the same as for 1929.

"WADE STACKHOUSE, Dillon, S. C.

"November 15, 1929."

"I agree to extend proposition to buy back farm till December 1, 1931—but all improvements that may be made to the farm will be added to the price of the farm.

"WADE STACKHOUSE.

"Nov. 29, 1930."

The defendant testifies that he was forced to accept these terms because he could get no others from the plaintiff.

There ensued a series of negotiations and letters between the parties extending over 1930-1934, in which the defendant was encouraged to believe that if he would pay up what

he owed the plaintiff the land would be redeeded to him. In the fall of 1933, defendant made application to the Federal Land Bank for a loan; W. C. Moore, Esq., an attorney at the Dillon bar, represented him. Mr. Moore testified:

"We were applying for a loan of $4,000.00—maybe $15,-000.00 ($5,000.00?) was the application and it was finally approved for $3,100.00.

"Q. Net to Dr. Stackhouse? A. That amount was allocated to the payment of Dr. Stackhouse. Doctor did not agree to accept that. Finally the loan was increased to $4,-000.00. That is the amount applicable to the payment to him.

"Q. $4,100.00, wasn't it? A. Maybe it was, it was approximately $4,000.00. I recall that when that finally came to my attention, I called Dr. Stackhouse on the phone and asked him if he would accept that, and he said he would not, and as far as negotiations for completing the transaction were concerned, he wouldn't go any further with them."

On cross examination he said that Dr. Stackhouse or Mr. Stanton told him that Dr. Stackhouse would take $5,000.00 subject to the Land Bank mortgage. Witness knew as a fact that the approximate total indebtedness was $8,000.00. It appears elsewhere in the testimony of the plaintiff that $2,-000.00, approximately, of this indebtedness arose from the farming operations after the execution of the deed. It is a fair inference that if plaintiff had accepted the check of Mr. Rogers in 1929, this extra indebtedness would not have accumulated.

It is established by the evidence that this is a valuable tract of land, worth $50.00 to $75.00 an acre. Mr. Rogers testified that it was worth that in 1929, when the deed was made. Plaintiff himself had owned it, and had sold it to the father of defendant for $100.00 an acre; since which sale defendant had put several thousands of dollars of improvements on the place and it was in a high state of cultivation.

The close examination of this case leads us to the inevitable conclusion that this deed, when made, was intended to

be, and therefore was, a mortgage. The subsequent dealings and transactions did not change its nature. "Once a mortgage, always a mortgage," unless there is additional consideration for any change made; and there is no evidence of such additional consideration.

In the quoted case of *Leland v. Morrison,* Judge Gage, who heard the case on circuit and whose decree was affirmed by this Court, said: "Above all things no harm can come to Morrison by granting the relief sought. He cannot lose a cent. He testified that the improvements, which cost him some $5,000.00, are on such part of the whole as may be set aside to him when partition be had. He is entitled to have that remedy to protect him from loss. He is furthermore entitled to have Leland's half interest first subjected to the payment of all sums which Morrison has paid, and which Leland ought to have paid. When that has been done, if there yet be a surplus, then Leland is entitled to it. *It seems to me that this is complete equity.*" (Italics added.)

In imitation of the just principle of this eminent jurist—no less renowned for his knowledge of the law, than for his acute sense of justice—we think it would be "complete equity" to provide a method which will amply safeguard the rights of plaintiff and protect those of defendant.

The plaintiff testifies that he does not want this land; that he has some 6,000 acres now; he only wants his money. The defendant does want the land; he ought to pay what he owes the plaintiff; he has availed himself of the right contained in the contract for the execution of the deed, to occupy the land in the effort to redeem it. He ought, therefore, in justice to the plaintiff, pay whatever debt he has incurred to the plaintiff in connection with the advances for his farming operations made to him by plaintiff in pursuance of that agreement. It is apparent from the record that the parties do not agree on that amount.

It is the judgment of this Court that the deed executed by defendant to plaintiff on the 14th day of January, 1929, was intended to be, and is, a mortgage.

That the decree of the Circuit Judge is reversed.

That the case be remanded to the Circuit Court for Dillon County with instruction to refer it to the Master for that county to ascertain and report the amount due from the defendant to the plaintiff on the equitable mortgage so as above held; and also the amount due from defendant to plaintiff on the farming operations of defendant on the land in question, since the making of the said mortgage. Upon the coming in of the Master's report; and the confirmation thereof, the Circuit Court shall give judgment in favor of plaintiff against the defendant for the amount thus found to be due; and the Circuit Court shall fix a reasonable time in which defendant shall pay that sum to the plaintiff; and if defendant does not make such payment, the Circuit Court shall issue to the plaintiff its decree in foreclosure of the said tract of land, in the usual form of foreclosure; and barring the defendant's equity of redemption.

Mr. Chief Justice Stabler and Mr. Justice Baker concur.

Messrs. Justices Carter and Fishburne dissent.

Mr. Justice Carter (dissenting): This case, which was comes to this Court on appeal from the decree of his Honor, tried in the Court of Common Pleas for Dillon County, Judge G. Dewey Oxner, who heard the case on the Circuit. The facts and issues involved are sufficiently set forth in the decree of Judge Oxner, and for the reasons stated therein I think the judgment of the lower Court should be affirmed. I therefore most respectfully dissent from the leading opinion.

Mr. Justice Fishburne concurs.